# IN THE COURT OF APPEALS OF IOWA

No. 13-1442
Filed June 11, 2014

IN RE THE MARRIAGE OF MICHAEL GIRRES
AND JESSICA GIRRES

Upon the Petition of
**MICHAEL GIRRES,**
        Petitioner-Appellant,

**And Concerning**
**JESSICA GIRRES,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Kossuth County, David A. Lester,

Judge.


        Michael Girres appeals various provisions of a dissolution decree.

**AFFIRMED AND REMANDED WITH DIRECTIONS.**


        Christopher R. Kemp of Kemp & Sease, Des Moines, for appellant.

        Donald J. Capotosto, West Bend, for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**VAITHESWARAN, P.J.**

Michael Girres appeals various provisions of a dissolution decree.

## I. Background Facts and Proceedings

Michael and Jessica Girres married in 2005 and divorced in 2013. The district court granted Jessica physical care of their two children, born in 2004 and 2010; ordered Michael to pay Jessica child support of $705.64 per month; ordered Michael to pay an additional $100 per month per child of child support to defray parochial school costs; required Michael to provide medical insurance for the children; and equally divided the couple's property and debts.

On appeal, Michael contends the district court (A) should have granted him physical care of the children, (B) incorrectly calculated child support and should not have ordered the additional $100 per child of child support per month, and (C) acted inequitably in distributing the property. Our review is de novo. Iowa R. App. P. 6.907.

## II. Analysis

### A. Physical Care

Michael contends the district court should have granted him physical care of the children because: (1) Jessica was not the primary caretaker; (2) he was the better parent; (3) he demonstrated more stability than Jessica in his housing and employment; (4) Jessica was incapable of promoting a healthy relationship; (5) Jessica's boyfriend had an unsavory past; and (6) Jessica was the primary source of poor communication between the parties.

***1. Primary Caretaker.*** Continuity of caregiving is an important factor that must be considered in custody and care decisions. *In re Marriage of Hansen*,

733 N.W.2d 683, 696 (Iowa 2007). In granting Jessica physical care, the district court found that she served as the children's primary caretaker during the marriage and after the separation. In fact, the record reflects that both parents were actively involved in the children's care. While Jessica stated that Michael was "gone more than [she] was," she also testified each parent "spent probably equal amount of time with the kids." She explained that Michael took care of the children three evenings a week while she was at work and, on those nights, was "responsible for doing the homework and reading and bath." This testimony alone supports Michael's assertion that Jessica was not the primary caretaker.

*2. Parenting Abilities.* Michael next cites a litany of "bad acts" by Jessica that, in his view, render her a poor parent. He asserts that Jessica broke into his home to retrieve the children the night before school started, physically harmed them, and did not play with them.

Jessica admitted to the break-in, testifying she "took a rock and [] cut the screen" to get in the porch window of the house she previously shared with Michael. She rationalized her conduct by focusing on Michael's failure to follow an informal child-exchange agreement.

We agree with Michael that Jessica's conduct was unacceptable. That said, Michael engaged in similar conduct, choosing to enter the garage of Jessica's home and ransack her car. We conclude both parents failed to consider the serious consequences of their hotheaded actions.

We turn to Michael's allegations that Jessica physically abused the children. The Department of Human Services investigated his allegations and found them to be "not confirmed." Notably, the department also investigated an

allegation that Michael domestically assaulted Jessica in the presence of the younger child, determined that allegation to be founded, and placed Michael on the central abuse registry. Contrary to Michael's assertions, therefore, physical abuse allegations weigh in favor of placing the children with Jessica.

Michael also faults Jessica for failing to play with the children. He asserts that she spent time on the computer instead of engaging with them. Jessica acknowledged that she might have responded to emails and sent pictures to her mother while the children were in her care. She denied ignoring the children. The district court found her testimony to be more credible, stating "the majority of Mike's testimony regarding the custody issue was negative, demeaning, inflammatory, and clearly meant to put Jessica in the worst light possible, while at the same time overlooking Mike's own shortcomings as a parent." We give weight to this credibility finding. *See* Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). We conclude the examples cited by Michael do not establish that he is the better parent.

*3. Stability.* Stability is also an important factor in the physical care determination. *Hansen*, 733 N.W.2d at 696. Michael notes that Jessica lost two jobs because of excessive absenteeism and moved several times. Jessica addressed these issues, explaining that she moved to a better neighborhood and secured a new job as a registered nurse. We conclude this factor does not militate in favor of reversal.

*4. Ability to Support Relationship.* "[T]he denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, [is] a significant factor in determining the proper custody

arrangement." Iowa Code § 598.41(1)(c) (2011). Michael cites Jessica's strained relationship with him and with his mother and sister as grounds to modify the physical care portion of the decree.

There is no question Jessica and Michael had difficulty getting along. However, Jessica did not stand in the way of Michael's relationship with the children. She allowed him to telephone them every night; sent them to a parochial school to accommodate the religious beliefs of Michael and his family; and facilitated informal weekly exchanges of the children before a temporary custody and visitation order was filed.

As for Jessica's relationship with Michael's mother, the mother on the one hand testified Jessica would not let her see the children but on the other hand said Jessica asked her to babysit the children on two occasions following the parents' separation. Her inconsistent statements could have affected her credibility.

We turn to Jessica's relationship with Michael's sister. That relationship was indeed strained but, by Jessica's account, she was not responsible for that tension. She testified that the sister never liked her and Michael knew "[s]he barely even acknowledges my kids."

The district court again credited Jessica's testimony over the testimony of Michael's family members, stating their testimony, like Michael's, was designed to place Jessica in the worst possible light. We give weight to this credibility finding and conclude Jessica supported Michael's relationship with the children.

**5. Jessica's Boyfriend.** "[I]f a parent seeks to establish a home with another adult, that adult's background and his or her relationship with the

children becomes a significant factor in a custody dispute." *In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003). Michael points out that Jessica's boyfriend had a criminal record. At the same time, he concedes the conviction is two decades old.

The district court expressed concern about Jessica's partner, stating Jessica chose "to pursue a relationship with a convicted felon at a time when the parties' children need[ed] her undivided attention" and "[t]his evidence suggests a level of instability and a lack of moral character that is, at the very least, concerning." The court proceeded to weigh Jessica's exercise of poor judgment against Michael's and concluded the physical care balance tipped in favor of Jessica notwithstanding her choice of partner. We are unwilling to second-guess this conclusion on our cold record, particularly in the absence of current evidence of wrongful acts by the boyfriend. *See id.* ("We agree with the district court's stated concern about this relationship's effect on the children but accept the district court's determination that this should not preclude Marcy from receiving primary care.").

***6. Poor Communication.*** "[An] important factor to consider in determining whether joint physical care is in the child's best interest is the ability of spouses to communicate and show mutual respect." *Hansen*, 733 N.W.2d at 698. Michael challenges the district court's finding that his "open hostility toward Jessica clearly demonstrates to the court that he will never be able to support Jessica's relationship with the children nor will he ever be capable of communicating with her in the manner required by law of a custodial parent." He contends Jessica was the poor communicator.

We agree with Michael that Jessica did not inform him of certain important events. She declined to tell Michael that their daughter was seeing a therapist, leaving it to the child to disclose this key development to her father. She also failed to notify Michael of school conferences.

Jessica's failures may in part be explained by a no contact order which, in her view, stymied communication with Michael. Jessica testified she was making efforts to have that order modified. In light of this action and her willingness to support communication between the children and Michael, we conclude her failure to inform him of certain important events does not require a change in physical care.

At the end of the day, we conclude the district court acted equitably in granting Jessica physical care. While certain factors give us pause, the district court was in the unique position of being able to see and assess the demeanor of the witnesses and the court's judgment from that vantage point is entitled to particular weight.

## B. *Child Support*

Michael next contends the district court incorrectly calculated child support and should not have required him to pay half of the children's parochial school tuition.

*1. Calculation of Child Support.* Michael asserts the district court failed "to use Jessica's income as supported by the record." On our de novo review, we note a lack of clarity on this issue.

The court used Jessica's "stipulated" monthly income of $2325.82 in calculating child support. In fact, the pretrial stipulation states the parties did not

agree on their respective net monthly incomes. Jessica claimed her income was $2325.82—the figure the court used—while Michael claimed her net monthly income was $3166.00. The child support guidelines included in the record list Jessica's adjusted net monthly income as $2052.45 (Jessica's worksheet) and $2394.10 (Michael's worksheet).[1] While Jessica testified her income as of the second day of trial had diminished, there is no indication she revised her child support guidelines worksheet to reflect this change. Her original worksheet also did not allocate the costs of the child's share of health insurance paid by Michael. Given these uncertainties, we remand for recalculation of child support using the most current financial data available in the record.

*2. School Tuition.* Michael next contends the district court erred in ordering him to pay an additional $100 per month per child towards the children's parochial school tuition. While the court used the child support guidelines to calculate the basic support figure, the court elected to deviate from the guidelines to add the additional $100 per month per child. This was the court's prerogative. *See* Iowa Ct. R. 9.11(1) (authorizing deviation from the guidelines following a written finding that "[s]ubstantial injustice would result to the payor, payee, or child(ren)" upon application of the guidelines). The court noted that Jessica "enrolled [the older child] in a Catholic school not because [Jessica] is Catholic, but because Mike wanted the children to attend Catholic school." Jessica testified that if it were up to her, she would probably have enrolled the child in a smaller public school. She explained, "I'm not Catholic, but Mike is, and he's

---

[1] Although Michael's income, found to be $2570.15, is not contested, his guidelines worksheet lists income of $2571.87.

pretty much raised a big fuss about the kids being in the Catholic school system. That was a lot of my motivation [to enroll the older child in a Catholic School]. I think you can get a good education anywhere." The court made a specific written finding that a variance from the child support guidelines was required "in order to properly fund the children's Catholic school education the parties' have agreed to provide." Under these facts, we conclude deviation from the guidelines was appropriate.

## C.    *Property Distribution*

Michael next contends the district court's property distribution was inequitable. First, he argues the court "misstat[ed] the equity in the marital home. On this issue, the district court stated:

> [T]he Court finds the date of trial value to be $80,000, with the residence being encumbered by a mortgage in the amount of $26,260. Mike is awarded this item of property, and shall assume payment of the mortgage encumbering it. This leaves equity in the marital residence of $53,740. Because this home was sold to the parties for only $30,000 by Mike's grandfather, which both parties acknowledge was a price well below the then applicable market value, the Court will address the allocation of this equity in the Conclusions of Law that follow.
> . . . .
>     Mike testified that the marital residence was a gift to him from his grandfather because his grandfather sold it to the parties for only $30,000; well below what the parties agree was the fair market value of the home at the time. In response to Mike's testimony that the marital residence constituted a gift, Jessica testified that she was not sure it was a gift but did not offer any further testimony or other evidence supporting that assertion nor did she provide the court with other evidence establishing any of the necessary *Muelhaupt*[2] factors set forth above. Accordingly, the court now concludes that Jessica's entitlement to a share of the equity in the home shall be limited to the difference in the purchase price of the home and the current mortgage balance, which amounts to the sum of $3740.

---

[2] *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989).

Michael contends the court also assigned him $3740 of equity in the home, resulting in equity of $7480 rather than the $3740 the court stated it would assign. He does not explain how the court's calculation affects his bottom line.

The court's findings and conclusions reflect that the court assigned less equity to Jessica than could have been assigned, given Jessica's failure to adequately contest Michael's assertion that the home was largely a gift from his grandfather. *See* Iowa Code §598.21(6) (stating gifted property is not subject to division). Had the court assigned Jessica half of the true equity in the home, which the court found to be $53,740, Michael's equalizing payment to her would have been much larger than the $5000 the court ordered. Under these circumstances, Michael is hard-pressed to argue that the court's division of the home equity was inequitable.

Michael next contests the district court's treatment of $8000 that Jessica conceded she withdrew from Michael's checking account. He does not specifically argue that Jessica improperly dissipated assets subject to division. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 700-03 (Iowa 2013). However, we believe that is the import of his contention.

"The dissipation doctrine applies when a spouse's conduct during the period of separation 'results in the loss or disposal of property otherwise subject to division at the time of divorce.'" *Id.* at 700-01 (citation omitted). "If improper loss occurs, the asset is 'included in the marital estate and awarded to the spouse who wasted the asset.'" *Id.* (citation omitted).

The district court applied this doctrine. The court determined that, after Jessica's withdrawal, each party received an equal share of the checking

account. Michael does not dispute this fact. Accordingly, we conclude the court's division of the checking account was equitable.

Michael also contends the district court did not appropriately consider the property and debts the parties brought into the marriage. He notes he had $16,000 in funds that he brought to the marriage, whereas Jessica brought about that much in debt.

The district court acknowledged Jessica's debts and noted that Michael paid them off as a gift to her. Based on that finding, the court declined to credit Michael for the payments. We conclude the court's disposition was equitable. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006) (noting the "trial court may place different degrees of weight on the premarital status of property" and rejecting the argument that a party "should be entitled to a 'credit' for the property . . . owned before the marriage and integrated into the marital coffers"). Given the broad language of *Sullins* quoted above, we find it unnecessary to delve further into the court's treatment of the parties' premarital assets and debts.

Michael also argues he should receive a credit for payments he made during the separation towards a van and the home. He acknowledges that assets are generally valued as of the date of trial but asserts that it is inequitable to do so here because Jessica received half the equity in these assets without contributing to the expenses for ten months.

As discussed, Jessica did not receive half of the true equity in the home; she was assigned only $3740. Michael, in contrast, received the home valued at $80,000 which had true equity of far more than he was assigned. Under these

circumstances, we see no reason to deviate from the date-of-trial valuation figure.

As for the van, the record reflects that the vehicle and debt associated with the vehicle were awarded to Michael.  While Michael made all the payments during the period of separation, that period was relatively short.  *See In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997) (stating different valuation date might be appropriate during separation that lasted for a period of years).  We conclude the court acted equitably in declining to credit Michael with the payments he made during the period of separation.

### III.    *Disposition*

We affirm the physical care and property provisions of the decree.  We remand the child support provision with directions to recalculate Michael's child support obligation based on the most current income and health insurance premium data in the record.  Costs on appeal are assessed equally to each party.

**AFFIRMED AND REMANDED WITH DIRECTIONS.**